IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| DAVID CLARK and DELLA CLARK, as guardians and conservators for JAMES W. CARROLL and DOROTHY M. CARROLL, | CV 20–155–M–DLC |
| Plaintiffs, | |
| vs. | ORDER |
| SILAC LIFE INSURANCE COMPANY, formerly d/b/a Equitable Life & Casualty Company, and JOHN DOES 1–20, | |
| Defendants. | |

Before the Court are Defendant SILAC Life Insurance Company's Motion for Summary Judgment and Motion to Dismiss (Doc. 29), Plaintiffs' Motion for Summary Judgment (Doc. 33), Defendant's Motion to Strike (Doc. 48), Defendant's Motion In Limine (Doc. 52), Plaintiffs' First Motion in Limine (Doc. 54), Plaintiffs' Second Motion in Limine (Doc. 56), and Plaintiffs' Third Motion in Limine (Doc. 58). The Court held a hearing on these motions on April 22, 2022. (Doc. 66.) For the reasons stated herein, Defendant's Motion for Summary Judgment (Doc. 29) will be granted, and Plaintiffs' Motion for Summary Judgment (Doc. 33), Defendant's Motion to Strike (Doc. 48), and all motions in limine will be denied as moot.

1

## FACTUAL AND PROCEDURAL BACKGROUND

James W. Carroll and Dorothy M. Carroll[1] (the "Carrolls") were the original plaintiffs in this action, and their court-appointed guardians and conservators, David Clark and Della Clark, were substituted as plaintiffs upon a showing that the Carrolls lacked mental capacity.  (Doc. 25; Doc. 18 at 1 n.1.)  The Carrolls filed suit against SILAC Insurance Company, formerly doing business as Equitable Life & Casualty Insurance Company ("Equitable"), asserting several causes of action against Equitable based on its alleged denial of insurance benefits.  (*See generally* Doc. 18.)

## I.     The LTC Policy

On March 27, 1990, the Carrolls applied for a Long Term Care Policy ("LTC Policy") with Equitable.  (Doc. 31-5.)  Equitable issued the policy with an effective date of March 27, 1990.  (Doc. 31-6.)

The first page of the LTC Policy states:

THIS POLICY PROVIDES BENEFITS FOR LONG-TERM CARE AND HOME AGAIN CARE THEREAFTER.  THIS POLICY IS GUARANTEED RENEWABLE FOR YOUR LIFETIME SUBJECT TO OUR RIGHT TO CHANGE PREMIUM ON A CLASS BASIS BY STATE.

---

[1] Parties who share last names with other parties are referred to by their first names for the avoidance of confusion.

(*Id.* at 6.)  The LTC Policy obligates Equitable to pay "the benefits provided in this Policy for losses described herein which begin while this Policy is in force.  All benefits are subject to the definitions, limitations, exceptions and all other provisions of this Policy.  All benefits are also subject to the provisions of any endorsement which may be attached."  (*Id.*)

Under the heading "RENEWAL CONDITIONS[,]" the LTC Policy states: "You may renew this Policy as long as You live.  To renew, just pay a renewal premium.  It must be paid on or before the end of the premium period or during the Grace Period. . . .  After this Policy is in force We cannot refuse to renew it or place any restriction on it if the premium is paid on time."  (*Id.*)  Under the heading "EFFECTIVE DATE[,]" the Policy states: "This Policy begins at 12:01 a.m. at Your residence on the Effective Date shown in the Policy Schedule.  It ends, subject to the Grace Period, at 12:01 a.m. on the date any renewal premium is due and not paid."  (*Id.*)

As relevant here, the LTC Policy describes two benefits.  The Long Term Care Benefit provides:

> We will pay the Eligible Charges for Your stay in a Long Term Care Facility or Nursing Home at the Percentage You selected when:
>
> 1)    Your stay begins while this Policy is in force;
> 2)    You receive Long Term Care Services; and
> 3)    Your Doctor certifies Your stay is reasonable and necessary to provide for Your health and safety.

3

We will pay this benefit up to the Maximum Benefit Period for any Period of Care.  Payment of benefits are subject to the Deductible Period and to all provisions of Your Policy.

*The Percentage at which Eligible Charges are paid, the Maximum Daily Amount of Eligible Charges Covered, the Maximum Benefit Period and the Deductible Period are listed on Your Policy Schedule (page 3).*

(*Id.* at 7.)  The Home Again Benefit provides:

To help in Your recovery following a Long Term Care stay, We will pay a benefit when You come home again.  Home Again Benefits will be paid regardless of who provides for Your care, including family members, friends, and home health agencies.  Benefits may be used for any need You may have, including adult day care or respite care.

We will pay the Home Again Benefit when:

1)      You come home again following a Long Term Care stay of more than 30 days; and
2)      Your Doctor certifies Home Again Care is reasonable and necessary to provide for Your health and safety.

We will pay a Home Again Benefit equal to:

1)      100% of the Home Again Daily Maximum for the first 15 days of Home Again Care;
2)      80% of the Home Again Daily Maximum for the next 45 days of Home Again Care; and
3)      60% of the Home Again Daily Maximum for all remaining days of Home Again Care used during Your lifetime.

We will pay Home Again Benefits for the number of days your Long Term Care stay exceeds 30 days, but for no longer than the Home Again Lifetime Maximum.  Home Again Benefits are not payable for any days during which You are confined to a Long Term Care Facility, Nursing Home or Hospital.  This benefit is subject to all other provisions of Your Policy.

> *The Home Again Daily Maximum and the Home Again Lifetime Maximum are listed on Your Policy Schedule.*

(*Id.*)  As to each benefit, the LTC Policy provides that "Each Period of Care separated by at least 6 consecutive months will fully restore Your Maximum Benefit Period[,]" and "The total of all benefits under this Policy are limited to the Maximum Lifetime Benefit."  (*Id.*)

Page 3 of the LTC Policy contains the Policy Schedule, which states:  "In this Policy We will often refer to Your Policy Schedule.  This schedule is important.  It tells You who is insured, the amount of premium and the amount of benefits You have chosen."  (*Id.* at 8.)  The Policy Schedule lists the Carrolls, their policy number, its effective date of 3/27/1990, their initial premium and renewal premiums, and the following Benefit Schedule:

MAXIMUM LIFETIME BENEFIT PER INSURED PERSON . . . UNLIMITED

MAXIMUM DAILY AMOUNT OF ELIGIBLE CHARGES . . . $150.00

PERCENTAGE OF ELIGIBLE CHARGES . . . 100%

MAXIMUM BENEFIT PERIOD . . . UNLIMITED*

DEDUCTIBLE PERIOD . . . 0 DAYS

HOME AGAIN DAILY MAXIMUM . . . $150.00

HOME AGAIN LIFETIME MAXIMUM . . . (5 YEARS) 1825 DAYS

*If benefits have been paid, for losses incurred prior to the attainment of age 65, the Maximum Benefit Period is limited to 10 years.

(*Id.*)  Additional provisions of the LTC Policy are discussed below as they become relevant.

## II.    The HomeCare Recovery Policy

On January 13, 1995, the Carrolls applied for a HomeCare Recovery Policy ("HCR Policy") from Equitable.  (Doc. 31-8.)  Equitable issued the HCR Policy with an effective date of January 13, 1995.  (Doc. 31-9.)

The introduction to the HCR Policy provides:

*THIS IS A LIMITED BENEFIT POLICY THAT PROVIDES RECOVERY BENEFITS FOR HOME CARE SERVICES.  THIS IS NOT A LONG TERM CARE POLICY.  THIS POLICY IS GUARANTEED RENEWABLE FOR YOUR LIFETIME SUBJECT TO OUR RIGHT TO CHANGE PREMIUM ON A CLASS BASIS BY STATE.  THIS IS NOT A MEDICARE SUPPLEMENT POLICY.  IF YOU ARE ELIGIBLE FOR MEDICARE, REVIEW THE BUYERS GUIDE AVAILABLE FROM THE COMPANY.*

(*Id.* at 3.)  Next to the heading "The HomeCare Recovery Policy[,]" the policy reads:

We insure You, named as the Insured in the Policy Schedule, and Your Spouse (if covered).  We promise to pay the benefits provided in this Policy for losses described herein which are incurred while this Policy is in force.  All benefits are subject to the definitions, limitations, exceptions and all other provisions of this Policy.  All benefits are also subject to the provisions of any endorsement which may be attached.

(*Id.*)  Next to the heading "Renewal Conditions[,]" the HCR Policy reads:

6

You may renew this Policy as long as You live.  To renew, just pay a renewal premium on or before the end of the premium period for which the preceding premium was paid or during the Grace Period.  The renewal premiums are shown in the Policy Schedule.  After this Policy is in force We cannot refuse to renew it or place any restriction on it if the premium is paid on time.

(*Id.*)  Next to the heading "Effective Date[,]" the HCR Policy reads: "This Policy begins at 12:01 a.m. at Your residence on the Effective Date shown in the Policy Schedule.  It ends, subject to the Grace Period, at 12:01 a.m. on the date any renewal premium is due and not paid."  (*Id.*)

The second page of the HCR Policy describes the "HomeCare RECOVERY BENEFITS":

> *Your Policy provides benefits for various levels of HomeCare Recovery Services.  These benefits are divided into levels described below. Within each level You will receive higher benefits when Your HomeCare Recovery Services are Prior Authorized.*
>
> HomeCare Recovery Benefits – Level I
>
> For each Period of Care, You are eligible for HomeCare Recovery Benefits – Level I followed an inpatient stay in a Hospital or Nursing Home.  The inpatient stay in a Nursing Home must have commenced within 30 days of Your discharge from a Hospital.  You will be assigned a DRG (Diagnostic Related Group) number based on the severity of Your medical diagnosis or procedure.
>
> 1)    We will pay You 100% of the Eligible Charges You incur during the first week You receive HomeCare Recovery Services.
> 2)    Following the first week, We will pay You:
>     a)    100% of the Eligible Charges You incur for HomeCare Recovery Services that are Prior Authorized; or
>     b)    75% of the Eligible Charges You incur for HomeCare Recovery Services that are not Prior Authorized.

7

Your HomeCare Recovery Services must begin within 30 days following Your discharge from a Hospital or Nursing Home.  Eligible Charges are limited to the dollar amount for Your DRG as shown on the HomeCare Recovery Schedule.

HomeCare Recovery Benefits – Level II

For each Period of Care, You are eligible for HomeCare Recovery Benefits – Level II after any of the following events: outpatient surgery that required general anesthesia; outpatient eye surgery without general anesthesia; or a bone fracture or dislocation of a major joint that did not require You to be confined to a Hospital.  We will assign You a DRG number as if these procedures were done on an inpatient basis.

1)      We will pay You 75% of the Eligible Charges You incur during the first week You receive HomeCare Recovery Services.
2)      Following the first week, We will pay You:
        a)      75% of the Eligible Charges You incur for HomeCare Recovery Services that are Prior Authorized; or
        b)      50% of the Eligible Charges You incur for HomeCare Recovery Services that are not Prior Authorized.

Your HomeCare Recovery Services must begin within 30 days of Your outpatient surgery, bone fracture or dislocation.  Eligible Charges are limited to the dollar amount for Your DRG as shown on the HomeCare Recovery Schedule.

HomeCare Recovery Benefits – Level III

You are eligible for HomeCare Recovery Benefits – Level III either following Your discharge from a Nursing Home stay of at least 7 days, or during a period when You are receiving Skilled Care Services on 2 or more days per week from a Registered Nurse or Registered Physical Therapist.

1)      We will pay You 75% of the Eligible Charges You incur during the first week You receive HomeCare Recovery Services.
2)      Following the first week We will pay You:

> a)      75% of the Eligible Charges You incur for HomeCare Recovery Services that are Prior Authorized; or
> b)      50% of the Eligible Charges You incur for HomeCare Recovery Services that are not Prior Authorized.
>
> HomeCare Recovery Benefits-Level III will not be payable if You are eligible to receive HomeCare Recovery Benefits under Level I or II. However, should no further benefits be payable under Level I or II because Your Eligible Charges exceed Your assigned DRG maximum, You may qualify for HomeCare Recovery Benefits-Level III by meeting the above requirements.
>
> Your HomeCare Recovery Services must begin within 30 days of Your discharge from the Nursing Home or be during a period You are receiving Skilled Care Services on 2 or more days per week.  Eligible Charges are limited to the Lifetime Maximum shown on Page 11 of the HomeCare Recovery Schedule.

(*Id.* at 4.)

Page 3 of the HCR Policy contains the Policy Schedule, which lists the Carrolls as the Insured and Spouse, their Initial Premium and Renewal Premiums, their Policy Number, the Effective Date of 1/13/1995, and the "First Renewal Date" of 4/13/2019.  (*Id.* at 5.)  Page 4 of the HCR Policy includes "OTHER IMPORTANT PROVISIONS":

> Diagnostic Related Group (DRG): A Diagnostic Related Group, or DRG, is that grouping number assigned under Medicare to a Hospital stay based upon primary and secondary medical diagnoses and procedures. . . .
> If two or more DRGs apply, HomeCare Recovery Benefits will be based upon the largest DRG Maximum.  HomeCare Recovery Benefits will be paid under only one DRG Maximum during any one Period of Care.

> Successive Periods of Care: Each Period of Care for HomeCare Recovery Benefits-Level I or II not separated by at least 6 consecutive months during which You do not receive HomeCare Recovery Services will be deemed one Period of Care.

(*Id.* at 6.) Page 11 of the HCR Policy includes the following "Lifetime Maximums":

> Lifetime Maximum Eligible Charges – Levels I & II: . . . UNLIMITED
>
> Lifetime Maximum Eligible Charges – Level III . . . $20,000.00

(*Id.* at 13.) Finally, page 12 of the HCR Policy contains the following relevant definitions:

> Eligible Charges Means the actual billed charges made by a HomeCare Recovery Provider for HomeCare Recovery Services provided to You which You are obligated to pay.
>
> HomeCare Provider Means an organization which: is licensed by the state as a home health care provider and is operating pursuant to law under that license or; is acceptable to Us to provide HomeCare Recovery Services through qualified persons if licensing is not required. A HomeCare Recovery Provider must not have a financial interest or relationship with You or any member of Your family, other than an arrangement to provide HomeCare Recovery Services.
>
> HomeCare Recovery Services Means any medical or personal care service provided by a HomeCare Recovery Provider, including but not necessarily limited to nursing care, physical therapy, occupational therapy, speech therapy, home health aide, medical-social services, homemaker services, nutritionist services, hospice care, and transportation. HomeCare Recovery Services must be recommended by Your Doctor for Your health and safety. HomeCare Recovery Services can not be provided to You while you are an inpatient in a Hospital or Nursing Home.
>
> …

10

Period of Care Means a period of time beginning with the first day You receive HomeCare Recovery Services for which HomeCare Recovery Benefits-Level I or II are payable.  A Period of Care ends on the last day You receive HomeCare Recovery Services prior to 30 consecutive days during which You did not receive HomeCare Recovery Services and were not confined to a Hospital or Nursing Home.

…

Skilled Care Services Means only those HomeCare Recovery Services of a rehabilitative, therapeutic or medical nature.  Skilled Care Services do not include homemaker services, nutritional services, hospice care, transportation or personal care services by a home health aide which assist a person in the activities of daily living.

(*Id.* at 14.)  Additional provisions of the HCR Policy are discussed below as they become relevant.

## III.    The Carrolls' Insurance Claims

Dorothy was admitted to St. Patrick's Hospital on July 26, 2018.  (Doc. 31-10 at 4.)  She was discharged from the hospital to The Village Health and Rehab ("The Village") on August 8, 2018.  (Doc. 31-11 at 8.)  She began privately paying for her stay at The Village on October 5, 2018.  (*Id.* at 5.)  She was discharged from The Village to her home after 79 total days on October 26, 2018.  (*Id.*)  In January 2019, she submitted an insurance claim to Defendant under the LTC Policy for the portion of her stay at The Village that was not covered by her Medicare Advantage plan and for the Home Again Benefit.  (*See generally* Doc. 31-11.)  Defendant paid $3,150 under the LTC Benefit ($150 per day for the 21

11

days that Dorothy privately paid for her stay) and $6,330 under the Home Again Benefit ($2,250 for the first 15 days, and $4,080 for the following 34 days).  (*Id.*; Doc. 31-12.)  Dorothy also submitted a claim under the HCR Policy, and Defendant determined that she was eligible for a maximum benefit of $19,200 in Level I benefits under the HCR Policy based on her DRG and $15,000 in Level III benefits.  (Doc. 31-10.)  Defendant paid Dorothy $19,200 in Level I benefits and $15,000 in Level III benefits.  (Doc. 31-20.)

James was admitted to St. Patrick's Hospital on October 19, 2018, and he was discharged on October 24, 2018.  (Doc. 31-15.)  Defendant determined that James was eligible for a maximum benefit of $7,600 under the HCR Policy based on his DRG.  (*Id.*)  Defendant paid James $7,600 in Level I benefits.  (Doc. 31-19.)

James was admitted to St. Patrick's Hospital again on April 10, 2019, and he was discharged on April 11.  (Doc. 31-21.)  Defendant determined that no benefits were owed under the HCR Policy because James was in the same Period of Care that began after his first hospital stay on October 19, 2018, and the DRG for his April hospitalization was lower than the DRG for his October hospitalization.  (*Id.*)

James was again admitted to St. Patrick's Hospital on May 24, 2021, and he was discharged on May 28, 2021.  (Doc. 31-22.)  Defendant determined that he was eligible for a maximum Level I benefit of $11,600 under the HRC Policy based on his DRG for that hospitalization.  (*Id.*)

12

Additional facts are discussed as they become relevant below.

## IV.   This Lawsuit

Plaintiffs filed this lawsuit in state court on May 21, 2020.  (Doc. 3.)
Defendant removed the case to this Court on October 23, 2020 (Doc. 1), and
Plaintiffs filed an Amended Complaint on February 11, 2011 (Doc. 18), which is
the operative complaint.

Plaintiffs allege that the LTC Policy "provide[s] unlimited benefits for stays
in long-term care facilities" like The Village where Dorothy stayed, but Defendant
breached that contract by claiming that it was not responsible for paying any
benefits paid by Medicare.  (Doc. 18 ¶ 46.)  Plaintiffs also allege that Defendant
owes additional Home Again benefits under the LTC Policy after Dorothy's
hospital stay.  (*Id.* ¶ 47.)  They allege that the LTC Policy violates Montana's Long
Term Care Insurance Act by conditioning receipt of home health care benefit on a
prior institutionalization, and, as a result of the LTC Policy's provision expressly
invalidating any Policy provision that conflicts with the law of the beneficiary's
state on the Policy's effective date, Defendant cannot enforce the prior
institutionalization requirement.  (*Id.* ¶¶ 40–41.)

As to the HCR Policy, Plaintiffs allege that the terms of the Policy provide
"unlimited" Level I and II HomeCare benefits for the Carrolls' lifetime.  (*Id.* ¶ 65.)
Plaintiffs also allege that the HCR Policy is a limited benefit policy and that

Montana no longer authorizes limited benefit policies because the State repealed its statutory scheme authorizing such policies.  (*Id.* ¶¶ 62–64.)

Count I of the complaint requests declaratory judgment; Count II alleges that Defendant breached its contractual obligations to Plaintiffs; Count III alleges that Defendant violated Section 33-18-201 of the Montana Code; Count IV alleges that Defendant violated Montana's Long Term Care Insurance Act and breached the implied covenant of good faith and fair dealing; Count V alleges that Defendant breached its fiduciary duty to Plaintiffs; Count VI alleges constructive fraud; and Count VII alleges fraud.  Each claim is discussed in further detail below.

## STANDARD OF REVIEW

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  Accordingly, only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered.  *Id.* at 247–48.

Summary judgment is inappropriate where the parties genuinely dispute a material fact: "that is, if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *Id.* at 248.  The court must view the evidence "in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, a party opposing a "properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (internal quotation omitted). "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Id.* (quoting 10A Charles Alan Wright et al., *Federal Practice and Procedure* § 2720 (3d ed. West 2014)).  "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion." *Id.*

## DISCUSSION

## I.    Defendant's Motion for Summary Judgment

The Court begins with Defendant's motion for summary judgment.  (Doc. 30.)

## A.    Plaintiffs' Claims Concerning the LTC Policy

Plaintiffs claim that Defendant owes additional benefits under the LTC

Policy.  First, they allege that Defendant's refusal to pay benefits for the portion of

Dorothy's stay at The Village that was covered by Medicare "is inconsistent with

its LTC Policy's bolded representation that . . . **THIS IS NOT MEDICARE**

**SUPPLEMENT COVERAGE**.'"  (Doc. 18 ¶ 46.)  Second, they allege that

Defendant owes additional Home Again Benefits (*id.* ¶ 47); although their

complaint does not allege with specificity what additional Home Again Benefits

are owed, they assert that those benefits "include home care provided by a licensed

home health care agency for '***any need*** [Carrolls] may have'" (Doc. 34 at 6),

suggesting that they seek coverage for all of their home health care expenses under

the LTC Policy.

The Court must begin with the express terms of the LTC Policy.  "The

interpretation of an insurance contract is a question of law. . . .  When a court

reviews an insurance policy, it is bound to interpret its terms according to their

usual, common sense meaning as viewed from the perspective of a reasonable

consumer of insurance products."  *Park Place Apartments, L.L.C. v. Farmers

Union Mut. Ins. Co.*, 247 P.3d 236, 239 (Mont. 2010).  "Exclusions from coverage

are to be narrowly and strictly construed because they are contrary to the

fundamental protective purpose of an insurance policy."  *Id.*  "When an insurance

16

policy is ambiguous, it is to be interpreted most strongly in favor of the insured and any doubts as to coverage are to be resolved in favor of extending coverage for the insured. . . .  An ambiguity exists where the insurance contract, taken as a whole, is reasonably subject to two different interpretations." *Id.*  However, ambiguity does not exist "just because the parties disagree as to the meaning of the contract provision," and "courts will not distort contractual language to create an ambiguity where none exists." *Giacomelli v. Scottsdale Ins. Co.*, 221 P.3d 666, 672 (Mont. 2009).  A consumer's "[e]xpectations which are contrary to a clear exclusion from coverage are not objectively reasonable." *Stutzman v. Safeco Ins. Co. of Am.*, 945 P.2d 32, 37 (Mont. 1997).

> **1.     Plaintiffs have received all benefits owed under the unambiguous terms of the LTC Policy.**

> **a.     Defendant does not owe benefits for the portion of Dorothy's stay at The Village that was covered by Medicare.**

The LTC Policy obligates Defendant to pay "the Eligible Charges for Your stay in a Long Term Care Facility or Nursing Home at the Percentage You selected when" certain criteria apply.  (Doc. 31-6 at 7.)  The LTC Policy defines "Eligible Charges" as "those expenses You are obligated to pay as a resident inpatient which are charged directly by the Long Term Care Facility or Nursing Home for services provided."  (*Id.* at 10.)  Additionally, under the heading "EXCEPTIONS[,]" the

LTC Policy states:  "*This section tells You when We will not pay benefits under Your Policy.*  This Policy does not cover any loss:  1.  For benefits paid under Medicare and any Federal or State law or regulation (except Medicaid) unless an Eligible Charge is made which You must pay[.]"  (*Id.* at 9.)  These provisions make clear that Defendant will pay for charges that the *insured* must pay.  Because Dorothy's Medicare Advantage plan covered part of her stay at The Village with no copay required of her (Doc. 31-11), Defendant did not breach its contract by refusing to pay LTC Benefits for those days.

Plaintiffs assert that the disclaimer in Defendant's "Outline of Coverage" for its LTC Policy that "THIS IS NOT MEDICARE SUPPLEMENT COVERAGE" is inconsistent with the LTC Policy's exclusion for benefits paid under Medicare, which renders the LTC Policy ambiguous as to whether it provides "unlimited benefits for stays in long-term care facilities like Village."  (Doc. 18 ¶¶ 25, 29, 31, 46–47.)  This contention is meritless for several reasons.  First, in addition to the provisions discussed above, which make clear that Defendant will pay only for charges that the insured must pay, the Policy Schedule clearly states that the "MAXIMUM DAILY AMOUNT OF ELIGIBLE CHARGES" is $150.00.  (Doc. 31-6 at 8.)  The maximum *lifetime* benefit is unlimited.  (*Id.*)  No consumer could reasonably expect the LTC Policy to provide "unlimited" benefits in light of the exclusions and daily maximum.

18

Second, the LTC Policy contains an "Entire Contract" clause, which provides that "[t]his Policy, with its endorsements and any attached papers is the entire contract between You and Us. . . .  No agent may change this Policy or waive any of its provisions."  (Doc. 31-6 at 11.)  The "NOT MEDICARE SUPPLEMENT COVERAGE" disclaimer is extrinsic to the contract between the parties and cannot alter the unambiguous terms of the contract; even if admissible, this evidence does not render the contractual language susceptible to the meaning offered by Plaintiffs.  *Richards v. JTL Grp., Inc.*, 212 P.3d 264, 273–74 (Mont. 2009).

Third and finally, a Medicare supplement policy has a specific definition under Montana law; it is a policy "that is advertised, marketed, or designed primarily as a supplement to reimbursements under medicare for the hospital, medical, or surgical expenses of persons eligible for medicare."  Mont. Code Ann. § 33-22-903(8).  There is no dispute of material fact that the LTC Policy fits within the definition of "Long-term care insurance" under Montana law, which expressly excludes "any insurance policy that is offered primarily to provide basic medicare supplement coverage."  Mont. Code Ann. § 33-22-1107(6)(b)(i).  Defendant's legally accurate statement that the LTC Policy is not Medicare supplement coverage does not render the LTC Policy ambiguous.

Under the unambiguous terms of the LTC Policy, Defendant was obligated to cover up to $150 in Eligible Charges per day during Dorothy's stay at The Village. Dorothy incurred Eligible Charges only between October 5 and October 26, when she began privately paying for her stay. (Doc. 31-11 at 5.) Defendant paid the daily maximum of $150.00 for those 21 days. (Doc. 31-12 at 2.) Defendant fulfilled its obligations under the express terms of the LTC Policy concerning Dorothy's stay at The Village, and it does not owe further LTC benefits for that stay.

> **b.    Defendant does not owe additional benefits for the Carrolls' home care under the LTC Policy.**

The LTC Policy obligates Defendant to pay the Home Again Benefit when "1) You come home again following a Long Term Care stay of more than 30 days; and 2) Your Doctor certifies Home Again Care is reasonable and necessary to provide for Your health and safety." (Doc. 31-6 at 7.) The Home Again Benefit is "equal to: 1) 100% of the Home Again Daily Maximum for the first 15 days of Home Again Care; 2) 80% of the Home Again Daily Maximum for the next 45 days of Home Again Care; and 3) 60% of the Home Again Daily Maximum for all remaining days of Home Again Care used during Your lifetime." (*Id.*) Defendant must pay "Home Again Benefits for the number of days your Long Term Care stay exceeds 30 days, but for no longer than the Home Again Lifetime Maximum."

20

(*Id.*)  The Policy Schedule states that the Home Again Daily Maximum is $150.00, and the Home Again Lifetime Maximum is "(5 YEARS) 1825 DAYS[.]"  (*Id.* at 8.)

As noted above, Dorothy was admitted to The Village for 79 total days. (Doc. 31-11 at 5.)  Under the terms of the LTC Policy, Dorothy was eligible for Home Again Benefits for 49 days, "the number of days your Long Term Care stay exceeds 30 days[.]"  (Doc. 31-6 at 7.)  Defendant paid $6,330 under the Home Again Benefit: $150.00 per day for a total of $2,250 for the first 15 days, and $120 per day for a total of $4,080 for the following 34 days.  (*See generally* Doc. 31-11; Doc. 31-12.)

Although Plaintiffs' arguments concerning the Home Again Benefit primarily focus on the legality of the prior institutionalization requirement, their complaint asserts that Defendant breached the terms of the LTC Policy by contending that it had paid the maximum allowable Home Again Benefit following Dorothy's stay at The Village because the "LTC Policy states the maximum benefit is 1825 days[.]"  (Doc. 18 ¶ 49.)  To the extent Plaintiffs claim that the LTC Policy is ambiguous concerning limitations on the Home Again Benefit because of the Home Again Lifetime Maximum, the Court must reject that claim under the plain terms of the policy, which makes clear that Defendant "will pay Home Again Benefits for the number of days your Long Term Care stay exceeds

30 days, but for no longer than the Home Again Lifetime Maximum." (Doc. 31-6 at 7.) No reasonable consumer of insurance products could understand the LTC Policy to obligate Defendant to pay the Home Again Benefit for as long as the insured utilizes in-home care, subject only to the Lifetime Maximum.

> **2.** **Montana's Long-Term Care Insurance Act does not amend the terms of the LTC Policy.**

Plaintiffs allege that Defendant's LTC Policy violates Montana's Long-Term Care Insurance Act, Mont. Code Ann. § 33-22-1103, *et seq*., by (1) failing to contain a separate paragraph describing "limitations or conditions on eligibility for benefits," (2) by conditioning the receipt of home health care benefits upon a prior hospitalization or institutionalization, and (3) conditioning eligibility for home care on prior institutionalization in long-term care for more than 30 days. (Doc. 18 ¶¶ 104–106.)

Section 1115 of the Long-Term Care Insurance Act provides:

(1) A long-term care insurance policy may not be delivered or issued for delivery in Montana if the policy conditions eligibility for a benefit:
  (a) on a prior hospitalization requirement;
  (b) provided in an institutional care setting on the receipt of a higher level of institutional care; or
  (c) other than waiver of premium, postconfinement benefits, postacute care benefits, or recuperative benefits, on a prior institutionalization requirement.
(2) A long-term care insurance policy containing a limitation or condition for eligibility other than those prohibited in subsection (1) must clearly label, in a separate paragraph of the policy or certificate entitled "Limitations or Conditions on Eligibility for Benefits", the

22

limitations or conditions, including any required number of days of confinement.

(3) A long-term care insurance policy that contains a benefit advertised, marketed, or offered as a home health care benefit may not condition receipt of a benefit on a prior institutionalization requirement.

(4) A long-term care insurance policy that conditions eligibility of noninstitutional benefits on the prior receipt of institutional care may not require a prior institutional stay of more than 30 days.

(5) A long-term care insurance policy that provides benefits only following institutionalization may not condition the benefits upon admission to a facility for the same or a related condition within a period of less than 30 days after discharge from the institution.

Mont. Code Ann. § 33-22-1115.

Defendant argues that this provision of the statute does not apply to the Carrolls' LTC Policy because the effective date of this provision was one day after the Effective Date of the LTC Policy.  (Doc. 30 at 9 n.1.)  Plaintiffs argue that the statute applies to policies delivered or issued for delivery in Montana on or after October 1, 1989, and the Carrolls' LTC Policy was issued on or after May 24, 1990.  (Doc. 38 at 5.)

While Plaintiffs are correct that the statute *generally* "applies to policies delivered or issued for delivery in [Montana] on or after October 1, 1989[,]" the section prohibiting prior hospitalization or institutionalization requirements, now codified as Section 33-22-1115, was expressly carved out from that effective date and was "effective one year after passage and approval[,]" and approval occurred on March 28, 1989.  1989 Mont. Laws 810.  In short, Section 33-22-1115 did not go into effect until the day after the Effective Date of the Carrolls' LTC Policy.

23

The parties dispute whether the LTC Policy was "delivered or issued for delivery" on March 27, 1990—the LTC Policy's Effective Date—or May 24, 1990—the date the policy was "checked" by the "Policy Issue Department."  (Doc. 39-21 at 2.)  Resolving the precise delivery or issue date is unnecessary, however, because the express contractual terms provide that "[a]ny provision of this Policy which, on its *Effective Date*, is in conflict with the laws of the state in which You reside on that date is amended to conform to the minimum requirements of those laws."  (Doc. 31-6 at 11 (emphasis added).)  Section 33-22-1115 did not go into effect until the day after the Carrolls' LTC Policy's Effective Date, and thus the LTC Policy was not automatically amended to conform with Section 33-22-1115.

Plaintiffs contend that Defendant "continued transacting insurance with Carrolls by renewing" the LTC Policy, and, thus, the Policy violated Section 33-22-1115 upon each renewal.  (Doc. 18 ¶¶ 107, 111, 114.)  The LTC Policy provides: "You may renew this Policy as long as You live.  To renew, just pay a renewal premium. . . .  After this Policy is in force We cannot refuse to renew it or place any restriction on it if the premium is paid on time."  (Doc. 31-6 at 6.)

Montana law distinguishes between a renewal, which is "the right to require the execution of a new lease or contract," and an extension, "which operates to extend the term of the original agreement, which then becomes a contract for both the original and the extended term."  *Helena Light & Ry. Co. v. N. Pac. Ry. Co.*,

186 P. 702, 705 (Mont. 1920), *overruled in part on other grounds by City of Billings v. Pub. Serv. Comm'n*, 214 P. 608 (Mont. 1923) (interpreting statute establishing Public Service Commission).  The Court must "look to the reading of the entire contract, and to the practical construction given to it by the parties themselves, rather than to the phraseology used." *Id.*  Although the LTC Policy refers to "renewal," the terms of the Policy make clear that Defendant intended to bind itself to the original terms of the Policy for the Carrolls' lifetimes without execution of a new contract, and the Carrolls' payments of renewal premiums thus operated as extensions of the original contract rather than renewals. *Id.* at 706–07; *see also Smith v. Cont'l Cas. Co.*, No. 20-3004, 2021 WL 4523706, at *4–9 (6th Cir. Oct. 4, 2021) ("[I]n the long-term care context, courts have consistently recognized whether the insurer can cancel coverage as a dividing line between extended contracts and renewed contracts."); *Bushnell v. Medico Ins. Co.*, 246 P.3d 856, 862 (Wash. Ct. App. 2011) (finding renewal where insurer reserved right to not renew); *Yoder v. Am. Travelers Life Ins. Co.*, 814 A.2d 229, 231 (Pa. Super. Ct. 2002) (holding that statute that prohibited prior institutionalization requirements in policies "delivered or issued for delivery" after the effective date did not apply to renewals); *id.* at 233 (holding that where insurer could not cancel contract, "absent a decision on [insured's] part to cancel the policy (by declining to pay the premiums), the contract was intended to and did remain in force under those

25

original terms"). Accordingly, the Carrolls' continued payments of premiums did not "renew" the LTC Policy such that the Policy was automatically amended by the passage of the Long-Term Care Insurance Act.

### 3. The LTC Policy's conditions on benefits do not violate Montana's Long-Term Care Insurance Act.

Assuming without deciding that Montana's Long-Term Care Insurance Act applies to the LTC Policy, the Court concludes that the LTC Policy's conditions do not violate the statute. The LTC Policy does not condition eligibility for any benefit on a prior hospitalization, nor does it condition eligibility for a benefit provided in an institutional care setting on the receipt of a higher level of institutional care. (Doc. 31-6 at 7.) The parties dispute whether the LTC Policy conditions eligibility for a benefit "other than waiver of premium, postconfinement benefits, postacute care benefits, or recuperative benefits, on a prior institutionalization requirement[,]" Mont. Code Ann. § 33-22-1115(1)(c), and whether the LTC Policy "contains a benefit advertised, marketed, or offered as a home health care benefit" that is impermissibly conditioned on a prior institutionalization requirement, *id.* § 33-22-1115(3).

The LTC Policy provides the Home Again Benefit "when . . . You come home again following a Long Term Care stay of more than 30 days[.]" (Doc. 31-6 at 7.) Plaintiffs contend that the Home Again Benefit is a home health care benefit

within the meaning of Section 33-22-1115(3), and thus its receipt cannot be conditioned on a prior institutionalization requirement.  Defendant argues that the Home Again Benefit is a recuperative benefit within the meaning of Section 33-22-1115(1)(c), which permits Defendant to condition receipt of the benefit on a prior institutional stay of not more than 30 days, Mont. Code Ann. § 33-22-1115(4). Defendant is correct as a matter of statutory and contractual interpretation.

> The LTC Policy described the Home Again Benefit as follows:
>
> To help in Your recovery following a Long Term Care stay, We will pay a benefit when You come home again.  Home Again Benefits will be paid regardless of who provides for Your care, including family members, friends, and home health agencies.  Benefits may be used for any need You may have, including adult day care or respite care.

(Doc. 31-6 at 7.)  Plaintiffs focus on the inclusion of "home health agencies" in the list of potential care providers to support their argument that the Home Again Benefit is a home health care benefit, but Montana's insurance code defines "home health care" narrowly as "services provided by a licensed home health agency to an insured in the insured's place of residence that is prescribed by the insured's attending physician as part of a written plan of care."  Mont. Code Ann. § 33-22-1001.  The LTC Policy's contractual language is much broader, obligating Defendant to pay benefits "regardless of who provides for [the insured's] care" and allowing the insured to use the benefits "for any need You may have[.]"  (Doc. 31-6 at 7.)  Additionally, the Home Again Benefit expressly is intended "[t]o help in

27

Your recovery following a Long Term Care stay"; it is expressly recuperative in nature and thus falls within the exception created by Section 33-22-1115(1)(c). Contrary to Plaintiffs' argument, this plain-text reading of the statute does not render subsection (3) superfluous; the statute's general prohibition on prior institutionalization requirements is subject to broad exceptions for postconfinement, postacute care, or recuperative benefits, Mont. Code Ann. § 33-22-1115(1)(c), and subsection (3) specifies that home health care benefits are *not* within those exceptions, even if, for example, they are provided postconfinement. Accordingly, the LTC Policy's institutionalization requirement for the Home Again Benefit does not violate Montana's Long-Term Care Insurance Act.

Assuming in Plaintiffs' favor that the LTC Policy was issued after the effective date of Section 33-22-1115 and the statute therefore does apply to the LTC Policy, the policy does *not* comply with Section 33-22-1115(2), which requires "[a] long-term care insurance policy containing a limitation or conditions for eligibility other than those prohibited in subsection (1)" to "clearly label, in a separate paragraph of the policy or certificate entitled 'Limitations or Conditions on Eligibility for Benefits', the limitations or conditions, including any required number of days of confinement." Mont. Code Ann. § 33-22-1115(2).  Plaintiffs argue that this non-compliance renders the prior institutionalization requirement void as contrary to public policy.  (Doc. 38 at 19–20.)

28

Plaintiffs' cases do not support voiding the prior institutionalization requirement as the remedy for the LTC Policy's noncompliance with Section 33-22-1115(2)'s disclosure requirement.  The Montana Supreme Court has explained that it has voided (1) coverage exclusions that result in failure to provide minimum coverage required by statutes; (2) subrogation clauses that undermine the made-whole doctrine; and (3) "provisions that render coverage 'illusory' by 'defeat[ing] coverage for which the insurer has received valuable consideration[,]'" particularly when a policy's anti-stacking provision means that an insurer received consideration for coverage not provided.  *Fisher ex rel. McCartney v. State Farm Mut. Auto. Ins. Co.*, 305 P.3d 861, 870 (Mont. 2013) (quoting *Bennett v. State Farm Mut. Auto. Ins. Co.*, 862 P.2d 1146, 1148 (Mont. 1993)).  The violation alleged here, by contrast, concerns the method of disclosing a limitation or condition to the insured.  Instead of disclosing the 30-day institutionalization requirement for the Home Again Benefit in a separate "Limitations" or "Conditions" paragraph, the LTC Policy discloses the requirement on the second page of the policy—its "BENEFITS" page—and as part of the benefit itself:  "We will pay the Home Again Benefit when: 1) You come home again following a Long Term Care stay of more than 30 days . . . .  We will pay Home Again Benefits for the number of days your Long Term Care stay exceeds 30 days, but for no longer than the Home Again Lifetime Maximum."  (Doc. 31-6 at 7.)

29

Plaintiffs have not produced any evidence that they were unaware of the 30-day institutionalization requirement for the Home Again Benefit or otherwise suffered any injury as a result of the LTC Policy's method of disclosing that requirement; rather, they contend that they were injured by Defendant's refusal to pay additional Home Again Benefits.  Nor could they produce any evidence that the LTC Policy's method of disclosure rendered their insurance coverage illusory, because they in fact received thousands of dollars in Home Again Benefits following Dorothy's hospitalization and stay at The Village in accordance with the terms of the insurance contract.  (Docs. 31-12, 31-20.)  Accordingly, the Court concludes that Defendant's method of disclosing the prior institutionalization requirement does not limit coverage in a manner that "contravene[s] an express statute, undermine the made-whole doctrine, constitute illusory coverage . . . , or violate public policy in any other way" such that the prior institutionalization requirement *itself* must be voided.  *Fisher*, 305 P.3d at 872.

The Court further observes parallels between this case and *High Country Paving, Inc. v. United Fire & Casualty Co.*, 507 P.3d 1165 (Mont. 2022), in which the Montana Supreme Court held that an insurer's technical violation of Montana's Property and Casualty Insurance Policy Language Simplification Act ("PSA") could not be used to invalidate an unambiguous policy exclusion.  *Id.* at 1168.  The court relied on the purpose of the PSA—"to establish minimum language and

format standards to make property and casualty policies easier to read"—as well as a provision stating that the statute's minimum policy simplification standards "are not intended to increase the risk assumed under policies" subject to those standards. *Id.* The stated purposes of the Long-Term Care Insurance Act are to:

> (1) promote the public interest;
> (2) promote the availability of long-term care insurance;
> (3) protect applicants for long-term care insurance from unfair or deceptive sales or enrollment practices;
> (4) establish standards for long-term care insurance;
> (5) facilitate public understanding and comparison of long-term care insurance policies; and
> (6) facilitate flexibility and innovation in the development of long-term care insurance coverage.

Mont. Code Ann. § 33-22-1102. Unlike Montana's PSA, the Long-Term Care Insurance Act plainly intends to increase the insurer's risk to the extent it establishes minimum standards for long-term care insurance, and it does not contain an express provision to the contrary. However, the separate paragraph requirement in Section 33-22-1115(2) does not place substantive limitations on the kinds of conditions insurers may impose, but rather regulates the method of disclosing those conditions or limitations to consumers. Because the prior institutionalization condition was unambiguously and prominently disclosed in the LTC Policy, the Court concludes that the reasoning of *High Country Paving* further counsels against invalidating the prior institutionalization requirement as a

remedy for Defendant's non-compliance with Section 33-22-1115(2) of the Long-Term Care Insurance Act.

In sum, Defendant has paid all benefits owed to Plaintiffs under the LTC Policy.

**B.      Claims Concerning the HCR Policy**

Plaintiffs allege that the HCR Policy's Level I and II HomeCare Benefits "are unlimited for Carrolls' lifetime[,]" and Defendant thus owes Plaintiffs payment "for Carrolls' home care throughout their lifetime, as required by Equitable's HCR Policy." (Doc. 18 ¶¶ 65–71.) As noted above, the Court must begin by analyzing the terms of the HCR Policy.

**1.      Plaintiffs have received all benefits owed under the HCR Policy.**

Plaintiffs' argument that Defendant breached the HCR Policy hinges on their interpretation of the HCR Policy as providing "unlimited" Level I and II benefits for the Carrolls' lifetimes. (Doc. 18 ¶ 65.) While it is true that the *Lifetime* Maximum Eligible Charges for Levels I and II are "UNLIMITED" (Doc. 31-9 at 13), this lifetime maximum follows the HCR Policy's description of benefits, which expressly limit the Eligible Charges for Level I and Level II HomeCare Recovery Benefits "to the dollar amount for Your DRG as shown on the HomeCare Recovery Schedule" (*id.* at 4); a subsection of the Policy labeled

32

"OTHER IMPORTANT PROVISIONS" that explains the use of DRGs and how Periods of Care are determined (*id.* at 6); and seven pages of "HomeCare Recovery Schedule Levels I & II" DRG maximums (*id.* at 7–13). No reasonable consumer of insurance products would understand the unlimited *Lifetime* Maximum Eligible Charges to render all of these preceding provisions and limitations superfluous. *Park Place Apartments*, 247 P.3d at 239; *Stutzman*, 945 P.2d at 37.

Plaintiffs rely heavily on various statements by Defendant's representatives in support of their argument that the HCR Policy is ambiguous as to whether it provides unlimited home health care benefits. First, they emphasize a statement by one of Defendant's representatives to the Carrolls' home health care provider that, under the HCR Policy, if the Carrolls received home health care services within 30 days following discharge from a hospital or nursing home, Defendant would "[p]ay 100% of the eligible charges that they incur during the first week, following the first week, we will pay 100% if those services are prior authorized and if they are not prior authorized, we'll just pay 75% at that point going forward. That's an unlimited time frame for them." (Doc. 38 at 27; Doc. 44 at 28–29.) Plaintiffs interpret this statement to mean that Defendant's representative understood "that the benefit was unlimited under the HCR Policy." (Doc. 38 at 27.) However, this statement does not create ambiguity concerning the HCR Policy's limits for two reasons.

33

First, the statement by Defendant's representative concerning the *time frame* for home care recovery benefits being unlimited is consistent with the express terms of the HCR Policy; Level I and II benefits are limited by maximum eligible charges for each DRG code, not by a specific time frame in which those maximum eligible charges must be incurred.  (*See generally* Doc. 31-9.)  Second, even if Plaintiffs reasonably could have interpreted the representative's statement to mean that the HCR Policy provided unlimited Level I or II home health care benefits, the express terms of the policy describe limited benefits, and the Entire Contract clause of the policy states that "[n]o agent may change this Policy or waive any of its provisions."  (Doc. 31-9 at 15.)  The statement by Defendant's representative that there is "an unlimited time frame" for Level I HCR Benefits does not support Plaintiffs' reading of the HCR Policy as providing unlimited Level I and II home health care benefits.

Plaintiffs further rely on a statement by an employee of Defendant in an internal email that "the Service Center Rep quoted to the HC Agency that the [Level I and II] benefit was unlimited" and noting that "[w]e are setting up training with the Service Center reps . . . on some of our lesser-known and harder-to-understand policies."  (Doc. 35-25 at 4.)  Even viewing this statement in the light most favorable to Plaintiffs, this characterization of the representative's description of the benefit as "unlimited" and acknowledgement that the HCR Policy may be

"harder to understand" than Defendant's other policies does not render the HCR Policy susceptible to Plaintiffs' interpretation that it offered unlimited coverage for home health care services for the reasons explained above.  The HCR Policy unambiguously limits Eligible Charges to the DRG code assigned for the insured's institutionalization or procedure for each Period of Care.  (Doc. 31-9 at 4, 6–13.)

With this conclusion in mind, the Court will analyze each of Plaintiffs' insurance claims under the HCR Policy.

### a.   Dorothy's July–August 2018 Hospitalization

Defendant paid $19,200 in Level I benefits and $15,000 in Level III benefits in response to Plaintiffs' claim for HomeCare Recovery Benefits after Dorothy's July to August 2018 hospitalization.  (Doc. 31-20.)  Plaintiffs do not dispute the DRG code assigned to this hospitalization, which determined the maximum Eligible Charges for this Period of Care.  (Doc. 31-9 at 4.)  Nor do they argue that the Level III benefits were incorrectly limited to $15,000.  (*Id.* at 4 (obligating Defendant to pay 75% of Eligible Charges incurred during first week insured receives HomeCare Recovery Services and 75% of Prior Authorized Eligible Charges incurred in following weeks), 13 (listing $20,000 lifetime maximum Level III Eligible Charges).)  Rather, they assert that the HCR Policy promised that "'HomeCare' benefits for Level I and II are unlimited for Carrolls' lifetime." (Doc. 18 ¶ 65.)  As discussed above, this interpretation of the HCR Policy is

objectively unreasonable.  Defendant fulfilled its obligations under the express
terms of the HCR Policy and does not owe additional Level I or Level III HCR
benefits concerning this hospitalization.

### b.      James' October 2018 Hospitalization

Defendant paid $7,600 in Level I HomeCare Recovery Benefits after
James's October 2018 hospitalization.  (Doc. 31-19.)  Here, again, Plaintiffs do not
dispute the DRG code assigned to this hospitalization, which determined the
maximum Eligible Charges for this Period of Care.  (Doc. 31-9 at 4.)  Instead, as
with Dorothy's July to August 2018 hospitalization, they argue that the HCR
Policy promises unlimited Level I benefits.  For the reasons discussed above, no
reasonable consumer of insurance products could interpret the HCR Policy to
promise unlimited home health care benefits.  Defendant fulfilled its obligations
under the express terms of the HCR Policy and does not owe additional Level I
HCR benefits concerning this hospitalization.

### c.      James' April 2019 Hospitalization

Defendant did not pay any benefits under the HCR Policy for James's April
2019 hospitalization because Defendant determined that James was in the same
Period of Care that began upon his October 2018 hospital stay, and his DRG for
his April hospitalization was lower than the DRG for his October hospitalization.
(Doc. 31-21.)  In addition to their argument that the Level I and II benefits are

unlimited, Plaintiffs claim that the HCR Policy's definition of "Period of Care" is "indecipherable" and the policy is ambiguous, and thus it must be interpreted in favor of providing coverage for the Carrolls' claims.  (Doc. 38 at 28–30.)

The HCR Policy expressly limits Level I and II benefits to "each Period of Care[.]"  (Doc. 31-9 at 4.)  The HCR Policy defines a Period of Care as "a period of time beginning with the first day You receive HomeCare Recovery Services for which HomeCare Recovery Benefits-Level I or II are payable.  A Period of Care ends on the last day You receive HomeCare Recovery Services prior to 30 consecutive days during which You did not receive HomeCare Recovery Services and were not confined to a Hospital or Nursing Home."  (*Id.* at 14.)  Under the heading "OTHER IMPORTANT PROVISIONS[,]" and next to a sub-heading of "Successive Periods of Care[,]" the HCR Policy states that "[e]ach Period of Care for HomeCare Recovery Benefits-Level I or II not separated by at least 6 consecutive months during which You do not receive HomeCare Recovery Services will be deemed one Period of Care."  (*Id.* at 6.)  The HCR Policy also states that "[i]f two or more DRGs apply, HomeCare Recovery Benefits will be based upon the largest DRG Maximum.  HomeCare Recovery Benefits will be paid under only one DRG Maximum during any one Period of Care."  (*Id.*)

Although these provisions are not especially simple, they are not ambiguous, because they are not reasonably subject to differing interpretations.  *Park Place*

*Apartments*, 247 P.3d at 239.  Under the terms of the policy, a Period of Care begins upon the insured's use of HomeCare Recovery Services for which benefits are payable and ends when the insured stops receiving those services *unless* the insured resumes the services within 30 days of that end date.  (Doc. 31-9 at 14.) And following the end date, there must be at least six consecutive months in which the insured does not receive HomeCare Recovery Services before a new Period of Care can begin.  (*Id.* at 6.)  If the insured resumes HomeCare Recovery Services within those six months, Defendant is obligated to pay only the maximum Eligible Charges for the largest DRG Maximum within that Period of Care.  (*Id.*)  By including these terms, the parties bargained to allocate the risk of incurring home health care costs following successive institutionalizations or outpatient procedures; Defendant agreed to pay up to the highest DRG maximum, thereby accepting the risk of having to pay for additional home care services following a major procedure shortly after paying for services following a minor hospitalization, while the Carrolls agreed to accept only the highest DRG maximum for each Period of Care, thereby accepting the risk that Defendant may not pay for all the expenses the Carrolls incurred, especially if multiple institutionalizations or procedures occurred in quick succession.  Plaintiffs have not set forth any facts demonstrating that Defendant incorrectly determined that James's April 2019 hospitalization and subsequent claim for benefits under the HCR Policy fell within

the six-month limitation on successive Periods of Care, nor have they asserted that

Defendant incorrectly determined that the April 2019 hospitalization's DRG

Maximum was less than the DRG Maximum for his October 2018 hospitalization;

instead, they dispute that James was in the same Period of Care "because the

HomeCare Policy's definition of 'period of care' does not make sense." (Doc. 39

at 23.)  As explained above, the Court disagrees.  There is no dispute of material

fact that Defendant fulfilled its obligations under the express terms of the HCR

Policy and does not owe additional Level I HCR benefits concerning the April

2019 hospitalization.

### d.    James' May 2021 Hospitalization

Defendant paid $11,600 in Level I HomeCare Recovery Benefits after

James's May 2021 hospitalization.  (Doc. 31-22.)  Here, again, Plaintiffs do not

dispute the DRG code assigned to this hospitalization, which determined the

maximum Eligible Charges for this Period of Care.  (Doc. 31-9 at 4.)  Instead, as

with Dorothy's July to August 2018 hospitalization and James's October 2018

hospitalization, they argue that the HCR Policy promises unlimited Level I

benefits.  For the reasons discussed above, no reasonable consumer of insurance

products could interpret the HCR Policy to promise unlimited lifetime home health

care benefits.  Defendant fulfilled its obligations under the express terms of the

HCR Policy and does not owe additional Level I HCR benefits concerning this
hospitalization.

### 2.    The HCR Policy Complies with Montana Law.

Plaintiffs allege that Defendant's HCR Policy violates Montana law because
Montana repealed its statutory scheme "authorizing" limited benefit disability
policies in 1997.  (Doc. 18 ¶¶ 108–109.)  Defendant responds that the repeal has no
effect on the legality of the HCR Policy because the HCR Policy was never
regulated under that statute.  (Doc. 30 at 20–21.)  Defendant is correct.  Since
1981, Montana has regulated home health care coverage under the Disability
Insurance chapter of Title 33 of the Montana Code, Mont. Code Ann. § 33-22-
1001, *et seq.*, but unlike the Long-Term Care Insurance Act, the statute governing
home health care coverage do not set any minimum standards for such coverage.
Rather, the statute merely provides that insurers and health service corporations
transacting health insurance business in Montana "shall make available . . . benefits
for home health care."  Mont. Code Ann. § 33-22-1002.

The repealed statute on which Plaintiffs rely, by contrast, authorized
"limited benefit" disability insurance policies that were defined by reference to the
statute itself, which limited its applicability to insurance policies that were
permitted not to comply with certain mandated health care coverage requirements
because they were issued to small employers, disabled workers, and select others.

Mont. Code Ann. §§ 33-22-1201–1204 (1995).  The HCR Policy plainly does not fall within the repealed statute's definition of a limited benefit disability insurance policy, and the repeal thus does not render the HCR Policy unlawful.

**C.    Defendant is entitled to summary judgment on Plaintiffs' claim of violation of the Long-Term Care Insurance Act and breach of the implied covenant of good faith and fair dealing.**

Defendant argues that Plaintiffs' claim that Defendant violated the Long-Term Care Insurance Act and breached the implied covenant of good faith and fair dealing is barred by the Unfair Trade Practices Act, which provides that "[a]n insured who has suffered damages as a result of the handling of an insurance claim may bring an action against the insurer for breach of the insurance contract, for fraud, or pursuant to this section, but not under any other theory or cause of action. An insured may not bring an action for bad faith in connection with the handling of an insurance claim."  Mont. Code Ann. § 33-18-242(3).  The UTPA plainly bars Plaintiffs' claim to the extent it attempts to assert a standalone violation of the Long-Term Care Insurance Act, and summary judgment for Defendant is warranted on that claim.  But courts appear to be divided concerning whether the UTPA prohibits a claim for contract damages based on an alleged breach of the implied covenant of good faith and fair dealing.  *Burton v. State Farm Mut. Auto. Ins. Co.*, 105 F. App'x 154, 159 (9th Cir. 2004) (affirming district court's dismissal

of implied covenant of good faith and fair dealing claim as preempted by UTPA);

*Steinke v. Safeco Ins. Co. of Am.*, 270 F. Supp. 2d 1196, 1199 (D. Mont. 2003)

(allowing implied covenant claim to proceed based on parties' agreement that

implied covenant claim would continue only as a contract claim).  The Court need

not resolve this issue, however, because Plaintiffs' claim that Defendant breached

the implied covenant of good faith and fair dealing rests on their allegations that

the LTC Policy and HCR Policy violate Montana law and that Defendant failed to

disclose that violation.  (Doc. 18 ¶¶ 94–117.)  Because, as discussed above, the

LTC Policy and HCR Policy do not violate Montana law except insofar as the LTC

Policy does not comply with the disclosure formatting requirements of the Long-

Term Care Insurance Act, and Plaintiffs have not submitted any evidence that they

were unaware of the prior institutionalization requirement or that this

noncompliance caused them any damages, summary judgment for Defendant on

Plaintiffs' breach of the implied covenant of good faith and fair dealing claim is

warranted.

**D.     Defendant is entitled to summary judgment on Plaintiffs' claim for breach of fiduciary duty.**

The UTPA clearly preempts Plaintiffs' tort claim for breach of fiduciary

duty.  Mont. Code Ann. § 33-18-242(3); *Burton v. State Farm Mut. Auto. Ins. Co.*,

105 F. App'x 154, 159 (9th Cir. 2004) (affirming district court's dismissal of

breach of fiduciary duty claim as preempted by UTPA).  Even if not preempted,

Plaintiffs' claim that Defendant breached its fiduciary duty to them is based on

their allegations that the LTC Policy and HCR Policy violate Montana law and that

Defendant "misrepresent[ed] the legalities of these policies in order to continue

collecting premiums from Carrolls."  (Doc. 18 ¶¶ 119–121.)  Because, as discussed

above, the LTC Policy and HCR Policy do not violate Montana law except insofar

as the LTC Policy does not comply with the disclosure formatting requirements of

the Long-Term Care Insurance Act, and Plaintiffs have not submitted any evidence

that they were unaware of the prior institutionalization requirement or that this

noncompliance caused them any damages, summary judgment for Defendant on

Plaintiffs' breach of fiduciary duty claim is warranted.

> **E.  Defendant is entitled to summary judgment on Plaintiffs' Unfair Trade Practices Act, fraud, and constructive fraud claims.**

To the extent Plaintiffs' UTPA, fraud, and constructive fraud claims are

based on their allegations that the LTC Policy and HCR Policy violate Montana

law and/or that Defendant misrepresented that the policies complied with Montana

law, Defendant is entitled to summary judgment on those claims because, as

discussed above, the LTC Policy and HCR Policy do not violate Montana law

except insofar as the LTC Policy does not comply with the disclosure formatting

requirements of the Long-Term Care Insurance Act, and Plaintiffs have not

submitted any evidence that they were unaware of the prior institutionalization requirement or that this noncompliance caused them any damages.

Plaintiffs also advance a claim under the UTPA and their fraud and constructive fraud claims based on alleged misrepresentations of pertinent facts or insurance policy provisions relating to coverages.  (Doc. 18 ¶¶ 90–93, 122–41.) Defendant argues that it is entitled to summary judgment on Plaintiff's UTPA claim under Section 33-18-242(5), which provides that an insurer may not be held liable under the UTPA if it had "a reasonable basis in law or in fact for contesting the claim or the amount of the claim, whichever is in issue."  The Court has already concluded that Defendant fulfilled all of its legal obligations under the express terms of the LTC Policy and the HCR Policy with respect to the Carrolls' claims, and Plaintiffs do not dispute the factual bases on which Defendant relied to contest their claims for unlimited benefits for home health care services. Accordingly, the Court concludes that Defendant "had a reasonable basis, factually and legally, to contest the [Carrolls'] claim[,]" and summary judgment for Defendant on Plaintiffs' UTPA claim is warranted.  *Oltz v. Safeco Ins. Co. of Am.*, 306 F. Supp. 3d 1243, 1259 (D. Mont. 2018).

The misrepresentations Plaintiffs identify as key to their fraud and constructive fraud claims (Doc. 38 at 35) require more precise parsing.

> To establish a *prima facie* case of actual fraud, the party asserting the claim must establish the following nine elements: (1) a representation;

44

> (2) the falsity of that representation; (3) the materiality of the representation; (4) the speaker's knowledge of the representation's falsity or ignorance of its truth; (5) the speaker's intent that the representation should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of the representation's falsity; (7) the hearer's reliance upon the truth of the representation; (8) the hearer's right to rely upon the representation; and (9) the hearer's consequent and proximate injury or damages caused by their reliance on the representation.

*In re Est. of Kindsfather*, 108 P.3d 487, 490 (Mont. 2005). Constructive fraud requires proof of the same elements except for the defendant's intent for the hearer to rely on the representation. *Durbin v. Ross*, 916 P.2d 758, 762 (Mont. 1996). The Court will address the misrepresentations alleged by Plaintiffs in the order Plaintiffs presented them in their opposition to Defendant's motion for summary judgment:

- "Equitable purposefully backdated the LTC Policy to avoid compliance with the LTC Act." (Doc. 38 at 35.) The Court has already concluded that the LTC Policy does not violate the Long-Term Care Insurance Act except to the extent that it does not comply with the disclosure formatting requirements of Section 33-22-1115(2) and that Plaintiffs did not submit any evidence that they were unaware of the prior institutionalization requirement or that this noncompliance caused them any damages. Plaintiffs have failed to establish any consequent and proximate injuries or damages caused by any reliance on the Effective Date of the LTC Policy.

45

- "The LTC Policy is ambiguous because it purports not to be a supplement but then only provides coverage supplemental to Medicare." (Doc. 38 at 35.) The Court has already concluded that Defendant's statement that the LTC Policy is not Medicare supplement coverage does not render the LTC Policy ambiguous and that the statement is not false under Montana's definitions of long-term care insurance and Medicare supplement insurance.

- "Equitable represented that the LTC Policy conforms to Montana law, even though it violates the LTC Act because it conditions coverage on a prior-institutional stay." (Doc. 38 at 35.) The Court has already concluded that the LTC Policy's prior institutionalization requirement for the Home Again Benefit complies with the Long-Term Care Insurance Act, Mont. Code Ann. § 33-22-1115(1)(c), (4).

- "Equitable never took any steps to comply with Montana law even when issuing endorsements and despite its representation that the policy would conform to the law." (Doc. 38 at 35.) The Court has already concluded that the LTC Policy does not violate the Long-Term Care Insurance Act except to the extent that it does not comply with the disclosure formatting requirements of Section 33-22-1115(2) and that Plaintiffs did not submit any evidence that they were unaware of the prior institutionalization requirement or that this noncompliance caused them any damages. Plaintiffs have failed

to establish any consequent and proximate injuries or damages caused by any reliance on the Effective Date of the LTC Policy.  Additionally, the Court has already concluded that the LTC Policy's self-amendment provision did not apply to Section 33-22-1115 because that Section was not effective until the day after the Effective Date of the LTC Policy, and the LTC Policy was not automatically amended upon its renewal (or issuance of endorsements) because the LTC Policy's terms make clear that the parties intended to bind themselves to the original terms for the Carrolls' lifetimes.

- "Equitable's Outline of Coverage contradicts the LTC Policy Schedule." (Doc. 38 at 5.)  Plaintiffs cite to paragraph 49 of the Amended Complaint, which states that the Outline of Coverage states that the maximum Home Again Benefit is 1460 days (four years), while the LTC Policy states that the maximum benefit is 1825 days (five years).  (Doc. 18 ¶ 49.)  There is no evidence that Plaintiffs have relied on this inconsistency between the Outline of Coverage maximum and the LTC Policy maximum or that such reliance caused them any injuries; rather, the evidence shows that the Home Again Benefits paid in this case were not limited by the lifetime maximum, but rather the terms of the benefit itself.  (*See* Doc. 31-6 at 7; Docs. 31-11, 31-12.)

- "Equitable admits the HCR Policy is 'a limited benefit policy' but 'did not issue any endorsements or amendments' to comply with Montana law after §33-22-1201, *et seq.*, MCA, [was] repealed."  (Doc. 38 at 35.)  The Court has already concluded that the HCR Policy did not fall within the repealed statute's definition of a limited benefit disability insurance policy, and the repeal thus did not render the HCR Policy unlawful.

- "Equitable told Carrolls they reached their 'lifetime maximum' benefit under the HCR Policy even though the policy purports to offer unlimited benefits." (Doc. 38 at 35.)  The Court has already concluded that the unambiguous terms of the HCR Policy provide unlimited Lifetime Maximum Eligible Charges for Level I and II benefits and a $20,000 lifetime maximum for Level III Eligible Charges, and Defendant's statement that the Carrolls had reached their lifetime maximum for Level III benefits based on their claim following Dorothy's July to August 2018 hospitalization was not false.

- "Equitable's policies materially represented to Carrolls that Equitable will provide coverage for long-term and home care."  (Doc. 38 at 35.)  Plaintiffs cannot establish that these representations were false; Defendant in fact provided coverage and paid benefits for Dorothy's long-term care and for Dorothy and James' home health care under the policies, and the policies did not represent that they would provide complete coverage for all home health

care costs the Carrolls incurred.  (Docs. 31-6, 31-9, 31-10, 31-11, 31-12, 31-20, 31-15, 31-19, 31-22.)

- "Equitable misrepresented that the policies provide 'lifetime benefits[.]'" (Doc. 38 at 35.)  The Court has already determined that no reasonable consumer of insurance products would interpret the unambiguous terms of the LTC Policy and the HCR Policy, each of which clearly sets forth conditions and limitations on the benefits provided, to provide unlimited benefits for long-term care or for home health care.  Accordingly, Plaintiffs have failed to identify a false representation.

- "Equitable continues to renew its policies it knows violate Montana law and while continuing to collect premiums."  (Doc. 38 at 35.)  The Court has already concluded that the LTC Policy does not violate the Long-Term Care Insurance Act except to the extent that it does not comply with the disclosure formatting requirements of Section 33-22-1115(2), that Plaintiffs did not submit any evidence that they were unaware of the prior institutionalization requirement or that this noncompliance caused them any damages, and that the HCR Policy does not violate Montana law.

Plaintiffs purport to identify "numerous additional facts" in support of their fraud claims relating to Plaintiffs' arguments that the LTC Policy and HCR Policy did not comply with Montana law (Doc. 38 at 37–39), but these facts do not

49

identify any misrepresentations made to Plaintiffs.  Finally, Plaintiffs quote

extensively from Della Clark's deposition, in which she testified about "phone

conversations . . . between two people talking about how the claim will be denied,"

"copies of the brochures that were out and advertised . . . conflict[ed] with what we

are being told now," and "the runaround" of requests for information concerning

the Carrolls' insurance claims, e.g., " 'We have Dorothy's stuff but we don't have

Jim's stuff,' and then two days later, 'We have Jim's stuff but we never got

Dorothy's stuff[.]'"  (Doc. 38 at 39.)  Plaintiffs do not identify how Defendant's

internal phone calls concerning denying claims constitute representations to

Plaintiffs; they do not identify any specific "conflicts" between Defendant's

advertising and the policies in addition to those already addressed by the Court;

and they have not produced any facts showing injury attributable to the process of

submitting documentation in support of the Carrolls' insurance claims.

Accordingly, Plaintiffs have failed as a matter of law to establish a prima facie

claim of fraud or constructive fraud.  Summary judgment to Defendant is

warranted on these claims.

**F.     Defendant is entitled to summary judgment on Plaintiffs' declaratory judgment claim.**

Plaintiffs' claim for declaratory judgment does not raise any issue or claim for declaratory relief not already resolved in Defendant's favor by this opinion. Defendant is entitled to summary judgment on this claim as well.

**II.     Remaining Motions**

For the foregoing reasons, Defendant is entitled to summary judgment on all of Plaintiffs' claims.  Accordingly, Defendant's motion for summary judgment (Doc. 29) will be granted, and Plaintiffs' motion for summary judgment (Doc. 33) will be denied as moot.  The Court has not relied on any evidence subject to the parties' motions in limine in resolving Defendant's motion for summary judgment, and accordingly, those motions will be denied as moot.  Defendant's motion to strike Plaintiffs' reply brief in support of Plaintiffs' motion for summary judgment will be denied as moot.

**CONCLUSION**

IT IS ORDERED that Defendant's motion for summary judgment (Doc. 29) is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' motion for summary judgment (Doc. 33) is DENIED AS MOOT.

51

IT IS FURTHER ORDERED that all motions in limine (Docs. 52, 54, 56, 58) are DENIED AS MOOT.

IT IS FURTHER ORDERED that Defendant's motion to strike (Doc. 48) is DENIED AS MOOT.

The Clerk shall enter judgment in favor of Defendant and close this case.

DATED this 3rd day of August, 2022.

_____
Dana L. Christensen, District Judge
United States District Court